EXCELSIOR DRUM WORKS et al. v. BORTEL et al.

(Circuit Court, N. D. New York. July 27, 1911.)

**1. PATENTS (§ 39*)—INVENTION.**

In making a structure having two adhering layers of wood veneer or other material in strips, the placing of the strips so as to break joints does not constitute patentable novelty or invention; such construction being old in the mechanical art generally.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 46; Dec. Dig. § 39.*]

**2. PATENTS (§ 328*)—INVENTION—HORNS FOR TALKING MACHINES.**

The Ruggiero and Bougiorno patent, No. 770,024, for a horn for phonographic and similar machines, composed of separate layers of fibrous material in longitudinal strips so arranged as to break joints, and the Cunnius patent, No. 784,385, for a trumpet for talking machines similarly constructed, preferably of wood, are both void for lack of patentable invention in view of the prior art; also *held* not infringed, if conceded validity.

In Equity. Suit by the Excelsior Drum Works, Lipman Kaiser, and Alfred R. Cunnius against Albert B. Bortel and Charles I. Bortel, trading as the Wooden Phonograph Horn Company. On final hearing. Decree for defendants.

Martin & Jones (Howard S. Okie and John P. Croasdale, of counsel), for complainants.

Howard P. Denison, for defendants.

RAY, District Judge. The complainant, Lipman Kaiser, owns United States letters patent to Ruggiero et al., No. 770,024, dated September 13, 1904, and the complainants Lipman Kaiser and Alfred R. Cunnius own the patent to Cunnius, No. 784,385, dated March 7, 1905. The complainant Excelsior Drum Works is sole and exclusive licensee under both patents.

The defendants are the makers and sellers of horns at Syracuse, N. Y., for phonographic and other similar machines, and the patents in suit relate to horns used for the same purpose. Claim 1 of the Ruggiero patent is in issue here, and reads as follows:

"1. A horn for phonographic and similar machines, composed of separate layers of fibrous material, each of said layers being composed of separate

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

longitudinal strips arranged so as to break joints, substantially as shown and described."

In the specifications the patentees say of their alleged invention:

"This invention relates to horns for phonographic and similar machines and the object thereof is to provide a horn for machines of this class which will do away with the mechanical, vibratory, and metallic sound usually produced in the operation of such machines and also produce a full, even, and continuous volume of sound, in which the articulation will be clear, full, and distinct. The invention is fully disclosed in the following specification, of which the accompanying drawings form a part, in which the separate parts of our improvement are designated by suitable reference characters in each of the views, and in which Figure 1 is a perspective view of our improved phonographic horn; Fig. 2, an end view thereof, and Fig. 3 a longitudinal section. In the practice of our invention we provide a horn $a$, composed of separate layers of longitudinally-arranged strips, $a^2$, said strips being preferably composed of wood or similar fibrous material. In the construction shown three of the separate layers are employed, as shown at $a^3$, and each of said layers is composed of six of the separate and longitudinally-arranged strips $a^2$. The separate layers $a^3$, which make up the horn $a$, may be secured together at the edges by glue or in any suitable way, and in practice said layers are preferably formed separately and inserted into each other, or the outer layer is first formed and the second and third layers inserted thereinto, and in this operation the outer surface of the second and third layers are covered with any suitable glue or adhesive material, and the separate parts or layers of the horn are thus securely held together and make up, in effect, a single homogeneous construction. Instead of forming the separate layers separately and inserting one within another, as hereinbefore described, the inner layer may first be formed and the separate longitudinal strips of the second layer secured thereon, after which the separate longitudinal strips of the outer layer may be secured in position, and in either event the separate layers are so connected as to break the joints thereof, as clearly shown in Figs. 1 and 2. In the smaller end of the horn $a$ is secured a short tube $b$, which is larger at its outer than its inner end, and this tube is also composed of wood or similar fibrous material and is intended to strengthen the smaller end of the horn, and in practice I secure on the smaller end of the horn a sleeve $c$, which is preferably composed of metal and which is also intended to give strength to the smaller end of the horn and facilitate the attachment of the horn to the machine without injury to the smaller end of the horn. It will be understood that the general form of the horn may be the same as other devices of this class, and the larger end thereof may be bell-shaped, if desired, and the connections of the horn with the machine is made in the usual manner. By means of our improvement we provide a horn for the purpose specified which will produce a constant and continuous volume of sound, in which the articulation will be clear, full, and distinct and which will not produce the mechanical, vibratory, and metallic sound usually produced by instruments of this class as heretofore constructed."

Claim 2 of the Ruggiero patent (not in issue here) reads as follows:

"2. A horn for phonographic and similar machines, composed of separate layers of fibrous material, each of said layers being composed of separate longitudinal strips arranged so as to break joints, and the smaller end of the horn being provided with a tube of fibrous material which is secured therein, substantially as shown and described."

This differs from claim 1, in that the small end of the horn is provided with a tube of fibrous material.

Claims 1 and 2 of the Cunnius patent are in issue, and read as follows:

"1. A trumpet for talking machines, comprising a conically-tapering body composed of a number of layers, the outer layer being composed of tapering strips separated by spaces tapering inwardly from the larger end of said body, a reinforcing-rim surrounding the body at said larger end, and filling-pieces retained by said rim and extending inwardly into said tapering spaces. "2. A trumpet for talking machines, comprising a conically-tapering body made of layers of tapering strips, the strips of each layer being separated by spaces tapering inwardly from the larger end of the body and breaking joints with the strips of the adjacent layer, an outer reinforcing-rim surrounding the body at the larger end thereof, filling-pieces retained by said rim and extending inwardly into the tapering spaces of the outer layer, and similar filling-pieces inserted in the spaces between the strips of the inner layer."

The patentee says of his invention:

"This invention relates to an improved trumpet for talking machines of all kinds which combines lightness with strength and resistance against injury by being dropped or from other causes, always preserving its original shape and appearance; and the invention consists of a trumpet for talking machines comprising a conically-tapering body composed of a number of layers, the outer layer being composed of tapering strips separated by spaces tapering inwardly from the larger end of said body, a reinforcing-rim surrounding the body at said larger end, and filling-pieces retained by said rim and extending inwardly into said tapering spaces. * * * My improved trumpet is made of conical shape and of thin strips, preferably of wood, which taper from the mouth to the inner small end. The body of the trumpet is made of two superposed layers of tapering strips $aa'$ the strips $a$ of the inner layer breaking joints with the strips $a'$ of the outer layer, as shown clearly in Fig. 2. The tapering strips are diminished in width toward the smaller end of the trumpet, some of them being terminated at some distance from the same, while others run through, so as to form a small tubular end $e$. The small end of the trumpet is surrounded by a layer $d$ of waterproof material—such as Japan cloth, hard rubber, or other suitable material—which serves as a handle for the trumpet and also for reinforcing the ends of the tapering strips at the small end of the trumpet. The outer end or mouth of the trumpet is reinforced by an exterior rim $r$ of wood or other suitable material, and the spaces between the exterior strips adjacent the rim are ornamented by short rounded-off strips or filling-pieces $p$, that impart a conical edge to said strips, and thereby an ornamental appearance to the outer wider end or mouth of the trumpet. Filling-pieces $p'$ are also interposed between the strips of the inner layer in the same manner, as shown in dotted lines in Fig. 1. The rim $r$ holds the short filling-pieces $pp'$ and the layers of tapering strips $aa'$ in position and imparts increased strength and finish to the mouth of the trumpet. The filling-pieces form a uniform continuous support for the reinforcing-rim $r$, serving thereby, in addition to the rim, for strengthening the outer end or mouth of the trumpet. As the trumpet is preferably made throughout of wood, it acts in the nature of a sounding-board and transmits the sounds spoken into the same in a better manner than the hard rubber or other trumpets used heretofore for talking machines and the like. Besides, the trumpet is more durable, as it can be dropped without injury or denting of the same, and it is also cheaper than the usual trumpets of brass and similar material."

It will be noticed that both claims of the Ruggiero patent are confined to a horn composed of separate layers of fibrous material, and that each of the layers is composed of separate longitudinal strips so arranged as to break joints. It will also be noticed that the patentees say:

"It will be understood that the general form of the horn may be the same as other devices of this class, and the larger end thereof may be bell-shaped

if desired and the connections of the horn with the machine is made in the usual manner."

The horns shown in the drawings are made of straight strips made in a triangular form, and, while the specifications say nothing of a round horn, I assume one was intended, as Fig. 2 shows this, and, if not round, it would be difficult for the strips of the one layer to break joints with those of the next layer. With thin strips of wood or other fibrous material this form is easily obtained. It is also easy to see that the patentee had in mind and in fact refers to horns made bell-shaped at the outer end. This shape is easily obtained with such material, as is well known, by simply slitting the outer end of the strip at the large or outer end of the horn, and bending them outwardly. The open spaces thus formed are covered and closed by the next layer made to break joints. Instead of merely slitting, triangular pieces may be cut out and removed if desired, and the opening covered by other strips or by the next layer properly cut.

The quotations from the specifications of the Cunnius patent describe what Ruggiero clearly had in mind, although Cunnius' horn is a conically tapering body, but it is made or formed in the manner already described. He has "a reinforcing-rim surrounding the body at said larger end (of the horn) and filling-pieces retained by said rim and extending inwardly into said tapering spaces." Round peach baskets, common in all markets and groceries, formed of strips of wood coming together at the small end and fastened or held by a reinforcing hoop or rim, and also having a reinforcing rim at the large or flaring end or top of the basket, are so common and well known that, having seen one, a correct idea of the structure of the Cunnius horn is at once in mind. True, in the horn the open spaces of the peach basket structure are closed by other strips, but this is matter of detail merely. The filling strips of the Cunnius patent may overlap the main strips or be inserted in the open spaces and glued. You may have two or more layers, the one structure inserted within the other. Having in mind the old speaking trumpets of metal and its uses, well known, I fail to find anything approaching patentable invention in either of the horns described in these patents, unless it be the putting together of the strips of fibrous material so as to form a horn composed of wood or other fibrous material. But this was clearly shown and described in the prior art, except that one layer was not inserted within another so as to break joints therewith.

## Prior Art.

When the application for the Ruggiero patent was filed, it had five claims, viz.:

"1. A horn for phonographs and similar machines, composed of separate layers of fibrous material, substantially as shown and described.

"2. A horn for phonographic and similar machines, composed of separate layers of fibrous material, each of said layers being composed of separate longitudinal strips, substantially as shown and described.

"3. A horn for phonographic and similar machines, composed of separate layers of fibrous materials, each of said layers being composed of separate longitudinal strips, and the smaller end of the horn being provided with a

tube of fibrous material which is secured therein, substantially as shown and described.

"4. A horn for phonographic and similar machines, composed of separate layers of fibrous material, and in the smaller end of which is secured a reinforcing tube of fibrous material substantially as shown and described.

"5. A horn for phonograph and similar machines, composed of separate layers of fibrous material and in the smaller end of which is secured a reinforcing tube of fibrous material, said smaller end being also closed by a metal sleeve, substantially as shown and described."

These claims were rejected July 27, 1904, by a communication as follows:

"This application has been duly examined. It is old in this art to construct a horn or megaphone from a layer of strips of fibrous material. See. Meyers, April 10, 1900, 647,147 (181—27), or Villy, Sept. 29, 1903, 739,954 (181—27). It is not believed that it would constitute invention to multiply the layers and to make the horn of two or more layers of strips instead of one layer of strips. The patent of Meyers, cited, and the patents of Merriman April 4, 1899, 622,379 (181—27), and Frost, July 8, 1884, 301,711 (46 Toys sounding), which discloses sleeves for the smaller end of the horn or megaphone and, it is held that it could not constitute invention to make this element of construction from fibrous material, the acoustic properties of fibrous material being of course well known. The claims must be rejected for want of patentable invention and novelty in view of the patents cited above as constructed."

[1] The present claims were then substituted and the idea of and provision for breaking joints was inserted, and then the substituted claims were allowed. So arranging that the two layers of strips break joints seems to have been held a new and novel idea and a structure composed of two layers of wood, the one layer breaking joints with the other, seems to have been deemed patentable. Such structures have been old for more than a century. In the Meyers patent of April 10, 1900, No. 647,147, which invention the specifications say "relates to sound transmitters or disseminators for phonographs, megaphones and similar machines; and the objects of the same are to produce a device designed to be attached to any ordinary sound-producing instrument and which will project or disseminate the sound in all directions radially from the instrument," we are shown both the straight and bell-shaped horn, which are made of a fibrous nonmetallic material, and says Meyers:

"As shown in Figs. 3 and 4, the horn or tube which I may use is made of cardboard or similar light and durable material, and such tubes may be made to occupy but little space in shipping, and at the same time be inexpensive and very efficient in use. When thus made, I take a piece of cardboard and score or crease it at intervals, or a sufficient number of strips 22 of cardboard or similar material and lay them edge to edge and attach to one or both faces thereof a piece of textile fabric 23, permitting one edge 24 of the fabric to project beyond the outer strip of the series. This edge may be readily gummed, so that the tube can be readily finished by moistening the gummed edge and attaching it to the opposite edge to complete the tube, or I may use other means for securing the edges. These tubes may thus be shipped flat or folded and can be easily made up by the purchaser. To make the tubes easily attachable to the reproducer-nipples any suitable number of spring-fingers 25 may be connected to the small end of the tube, and a wire ring 26 may be inserted into the large end of the tube to give the necessary strength to the device, or I may use a flat or flanged ring for

the end of the tube. Tubes made in this way may have a coating of aluminum paint or bronze to give them a metallic luster. I have found that tubes or horns made of a non-metallic material have a tendency to obviate the screeching sound so common in phonographs, and, besides, their lightness in weight makes them particularly desirable for my purpose."

It thus appears that the objections to the metallic horn were well known, and that it was also taught by Meyers that the use of a fibrous material such as cardboard would do away with these objections. His horns were bell-shaped as well as straight and composed of "a sufficient number of strips *22* of cardboard or similar material" placed edge to edge and united by strips or a covering of some textile fabric. He inserted a wire ring *26* in the large end of the horn to give the necessary strength, or he says, "I may use a flat or flanged ring for the end of the tube"; also, "tubes made in this way have a coating of aluminum paint or bronze to give them a metallic luster." In Meyers, instead of using two or more layers of fibrous material, the one within the other and breaking joints, a layer of textile material was used, glued on, which covered the joints of the cardboard strips. This horn had the advantage of being collapsible, the rings mentioned, when in place, holding the frame rigidly in position. It is obvious that a substitute of wood or other fibrous material would have served the same purpose as the textile fabric, except its use would have made the horn noncollapsible. I do not think the substitution discloses patentable invention.

In patent to Villy, No. 739,954, dated September 29, 1903, he shows and describes a bell-shaped horn in his cut, and says:

"I make the end *a* of trumpet-like or curved configuration with an enlarged outer end and a smaller end at the interior of the conoidal-like form. I make this enlarged and trumpet-like device by employing a series of strips *b* of paper, wood, linen, or other preferably flexible material, the foundations of which I prefer to make of linen or the like," etc.

Also:

"The outer ends of the segmental-like strips I prefer to protect by a bent or turned over edging *d* of metal making the connection rigid by pressing a portion of the strip of metal or other binding material into the edge of the paper or the like foundation."

In the patent to Merriman of April 4, 1899, No. 622,379, he says:

"The body portion of my megaphone consists of a conical tube 2 of the usual or any approved construction it being ordinarily made of leather, board, chemical fiber board or analogous material. * * * At the opposite or large end of the body portion of a megaphone it has been customary to attach a stiffening and strengthening rim of wood or metal."

He also describes his rim. At the small end he has a metallic tube which is made "of such size and taper that it will fit closely around the small end of the body portion *2*." The parts are assembled by slipping the one within the other. The body of this horn is not double its entire length, but there is clearly suggested a horn of more than one layer of material especially when made of strips. The patent to Sheble of May 10, 1904, No. 759,639, describes the objection to metal horns fully, and overcomes, or seeks to overcome, same by

covering the horn of sheet metal with a woven fabric, same being glued to the metal portion.

The patent to Hogan of May 7, 1901, No. 673,396, shows a horn or trumpet for phonographs, the main body of which is made of a sheet of celluloid, ising glass, gelatin, or the like; "the sheet being so cut that when its edges are brought together it takes the required shape." "The outer or layer end of the trumpet thus made is slightly flared. * * * A collar or bell D, of sheet metal is employed to form the finish or outer end of the trumpet," and this bell portion has a sleeve or extension, and the body portion is slipped through this so that the one shuts or closes upon the other.

The patent to Smith of March 6, 1900, shows and describes a horn in this art made in tapering sections fitting one within the other successively, and having a flaring bell-shaped end. These sections are made of sheet metal or other hard substance (might be of wood or cardboard), and the elbow of the horn is connected with the tubular end of the reproducer through "a sleeve or lining of fibrous or hard but practically nonresonant material whereby all metallic, foreign, or rattling sounds of the machine are eliminated from the amplifier." He also says the large end section or bell portion may be of metal, in which case he prefers to interpose a tubular lining. The prior art clearly taught the construction of horns of this description made of strips and also of sections of wood, cardboard, and the like material, and also taught the reason for the use of such material. It also taught the construction of same with a bell-shaped end. It taught the double construction, one part within another, and also the reinforcing rings to maintain the strips in place. Prior publications taught the construction of a horn with a series of layers of thin wood or veneer glued together, and this was practiced long before the patents in suit were applied for. The prior art did not point out specifically the construction of the patents in suit, or state that a horn made of thin strips of fibrous material suitably cut and glued together might be reinforced and strengthened by building another on the outside with the strips thereof so arranged as to break joints with those of the first, as we would lay shingles on a house or double board a barn or other structure.

August 17, 1901, one John C. Zeigenborn filed an application for a patent, in which he said:

"As shown in the drawings the horn A is preferably composed of an inner layer of veneer a, an outer layer b, and an intermediate layer c, although any desired numbers of layers may be used. In constructing the horn, the sheets of veneer are cut into triangular shape, substantially as shown in Figs. 3, 4, and 5, and wrapped successively around a suitable conical-shaped form (not necessary to be shown), and securely glued together. The meeting edges of each layer are beveled and lapped to effect a tight and firm joint as indicated at d in Fig. 2. *. *. * The inner layer a and intermediate layer c are composed of comparatively soft wood, preferably white wood, and the outer layer b is composed of harder wood, preferably mahogany. The inner and outer layers have their grains extending lengthwise of the horn, and the intermediate layer has its grain extending transversely as will be seen by reference to Figs. 3, 4, and 5."

He made and amended claims accordingly:

"6. As an improved article of manufacture, a horn for phonographs and analogous sound-reproducing machines, consisting of a conical shell composed of an inner and an outer layer of veneer, each disposed with its grain extending lengthwise the horn, and an intermediate layer disposed with its grain extending transverse the horn, the inner and intermediate layers being of one kind of wood and the outer layer being of another kind as set forth.
* * *

"10. A horn for phonographs and analogous sound-reproducing machines, comprising a plurality of conically bent sheets of veneer united telescopically and contiguously, said sheets each having its meeting edges beveled and lapped one upon the other and securely united, and bands surrounding the ends of the horn to securely bind the sheets together substantially as described."

This application was denied on the prior art.

[2] With this prior art before me, it is impossible for me to see any patentable invention disclosed by the improvements in this art, if any, by either of the patents in suit. The application was denied until the feature of breaking joints in the successive layers of wood was introduced. That this did not introduce patentable novelty, or even novelty of any kind into this application, has been decided in this circuit. Brunswick-Balke-Collender Co. v. Phelan Billiard Ball Co., 79 Fed. 85, 87, 24 C. C. A. 451. The syllabus is as follows:

"The Collender patent, No. 228,879, for a pool-ball frame with rounded interior and exterior corners, and made of layers of wood bent into triangular shape, and glued or fastened together, the layers preferably breaking joints, is void, as being the result of mere mechanical skill. 76 Fed. 978, affirmed."

The court said:

"The second claim is for a frame of curved or rounded corners, and made of a series of layers or veneers of wood, glued or fastened together, and bent into triangular shape. Preferentially, the ends can be joined together at different places on the frame, so as to break joints and secure greater strength. The novelty, in addition to the rounded corners, consists in the method of construction, whereby additional strength is imparted to the frame. It would hardly be claimed that the described mode of construction by layers of wood joined together is a new method of making any wooden article or structure, but it undoubtedly was a new method of making this article; and it made the frame stronger, and less liable to crack or to be strained at the corners. In like manner, the iron curve of the wagon reach in Hicks v. Kelsey, 18 Wall. 670, made a better, more durable, and more solid wagon reach than the pre-existing reach, which had a wooden curve, with or without strengthening straps of iron. But these advantages, the court thought, resulted from superiority of construction, and were the product of mechanical judgment in regard to the use of materials. The improvement in this case is of the same mere mechanical character. The decree of the Circuit Court is affirmed, with costs."

Within well-known rules of construction these patents, in view of the prior art and publications, are and must be limited to the precise construction shown and described. So limited, this defendant or these defendants do not infringe.

### Defendants' Horn.

The defendants' horn proper is made of a single piece of thin wood or cardboard or other like material so cut or slitted at its outer or bell-

shaped end that the slit portions may be bent or curved outwardly to form the bell shaped portion. In so cutting or slitting triangular pieces may be cut out entirely. These open spaces, when the main body is bent into shape, may be filled by triangular sections glued in, or first filled in this way, and then another or added section may be glued on in such position as to break joints thus adding to the strength of the horn. But this is mere mechanical skill well known and, as seen, held by the Circuit Court of Appeals in this circuit, Wallace, Lacombe, and Shipman, to fall short of patentable invention even if a new mode of construction as applied to the particular art as it was in that case. The probability is that those judges had seen a house covered with wooden shingles breaking joints so as to shed water and at the same time bind the roof more firmly as one whole; or a barn boarded in the ordinary manner with batten strips added, covering the cracks between the boards put on side by side, so as to break joints with the foundation boards nailed to the framework; or a brick or stone wall where masons for centuries have so laid the stone and brick as to break joints, and thus bind and prevent the wall from falling to pieces. Fig. 4 of Meyers patent of 1900, No. 647,147, plainly shows this idea of breaking joints, although the one layer was of cardboard and the other of some textile fabric. So to fill in a triangular space with a triangular piece of wood or metal of suitable size is not, to my mind, such a discovery in this century as to entitle one to a patent for so doing and applying it in this particular art. It may have been entirely new to Ruggiero and Cunnius and the examiners in the Patent Office, but was old in this art and old in the mechanical art generally, especially carpentry and cabinet making, so old that an intelligent court should take judicial notice of it. In any event it is so proved in this case.

The application for the Ruggiero patent was filed June 24, 1904, and that for the Cunnius patent October 11, 1904, and there is no proof carrying the date of their discoveries, alleged inventions, back of those dates respectively. From 1900 to 1907 John C. Zeigenhorn was engaged in the manufacture of wooden horns of this description and for use in this art at Syracuse, N. Y., and in 1907 he sold out his business to these defendants. Commencing in 1901, Zeigenhorn, defendants' predecessor in business, made and sold wooden horns for use in this art of three-ply veneer and some of two-ply with the joints of the layers overlapping or broken; that is, the ends of each layer where they came together were beveled so that one beveled end overlapped the other beveled end. The joints of the one layer were at a different point from the joints of the next layer. In other words, the different layers broke joints with each other. He also added to the horn proper veneer strips on the outside and his horn had, a bell-shaped end—small to be sure—but this goes to degree only. He also made a horn composed of separate longitudinal strips so arranged as to break joints. (See Exhibit Zeigenhorn No. 3.) The Exhibit Zeigenhorn No. 1 is made of three layers of wood or fibrous material, tapering strips of light and dark wood, and these break joints as an examination of the exhibit shows. He also had a wooden

rim on the outer or large end of these horns. All is plainly shown by the evidence of Zeigenhorn, Andrew S. White, Ross L. Andrews, and horn Exhibits 1, 2, and 3 made by Zeigenhorn as well as by Fig. 2 of Zeigenhorn's application for a patent. To give additional strength, Zeigenhorn so cut his wooden veneer as to have the grain of the wood extend lengthwise in the inner and outer layers and transversely in the intermediate layer. These horns were all round, and had a small tubular end for connecting the horn proper with the machine. The strips of Meyers and Mitchell extending from end to end of the horn and with the overlapping fabric forming the main body of the horn and the strips of Villy extending the entire length of the bell portion of his horn and the construction of Zeigenhorn are substantially identical with that of the patents in suit. There is change of form and degree, but not of principle of construction.

Hence, taking the horn made and sold by the defendants and complained of here, we find that it follows the prior art, excluding Ruggiero and Cunnius, substantially and closely, except that its longitudinal strips do not extend the entire length of the horn as is the case in some of the prior art. In both Ruggiero and Cunnius they describe, show, and claim a horn made of strips which extend the entire length of the body of the horn proper. Ruggiero is a substantial duplication of what Zeigenhorn, defendants' predecessor in business, was making and selling in 1901, 1902, and succeeding years, and long before Ruggiero applied for his patent. The enlargement of the outer end of the horn in the manner shown by Cunnius does not disclose patentable invention in view of the prior art and analogous arts. The horn now made by defendants is not made up of strips running substantially the entire length of the horn, and, even if Ruggiero and Cunnius disclose patentable invention, in view of the prior art, they are confined to what is shown and described, and defendants do not infringe. In view of the prior art, they have the right to make the bell portion by slitting and inserting and making same of two or more layers. And, as we have seen, they do not infringe by making these layers break joints as the ordinary mechanic would do. I have not referred to the ornamental features of either horn. Neither Ruggiero nor Cunnius have a design patent. Naturally they would so cut and shape the strips as to make the horn attractive in appearance if possible. Defendants have the right to do the same thing even if they copy the shape of the Cunnius horn. It is not enough that a thing should be new in the sense that the shape and form in which it is produced or put on the market should not have been known before, and that it should be useful, but it must under the Constitution and patent laws amount to an invention or a discovery. Hill v. Worster, 132 U. S. 693, 10 Sup. Ct. 228, 33 L. Ed. 502; Thompson v. Boisselier, 114 U. S. 1, 5 Sup. Ct. 1042, 29 L. Ed. 76. As stated, we have no new idea or principle or discovery as distinguished from mere mechanical skill in either Ruggiero or Cunnius. No new function performed; no new or improved result. Simply a change of form to an extent perhaps, and to an extent, in some details, a change in mechanical construction (but nothing

new in the mechanical art). This is not invention. Atlantic v. Brady, 107 U. S. 192, 2 Sup. Ct. 225, 27 L. Ed. 438, and numerous cases.

I hold in view of the prior art that the patents in suit are invalid as failing to disclose patentable invention, and that, conceding validity and giving to them the very narrow and limited construction to which they are entitled, defendants do not infringe.

There will be a decree dismissing the bill, with costs.