## BYRNES v. JOHNSON & JOHNSON.

District Court, D. New Jersey. January 28, 1930.

Thomas G. Haight, of Jersey City, N. J., and Moseley A. Keller, and Howard W. Dix, both of New York City, for plaintiff.

Archibald Cox, of New York City, for defendant.

RELLSTAB, District Judge. The plaintiff, assignee of letters patent No. 1,578,688, for a plaster of paris bandage, alleges infringement thereof by the defendant. This patent was issued March 30, 1926, to Edwin A. Spies, M. D., a specialist in orthopedic surgery, on his application of September 24, 1924.

The defenses are invalidity and noninfringement.

The defendant has for many years manufactured and sold surgical supplies. Since 1887 it has made and sold plaster of paris bandages for surgical use.

A plaster of paris bandage consists of a loosely woven cloth of desired width and length, with or without selvaged edges, sized with some sticky material, or unsized, with dry plaster rubbed into its meshes and lying between its layers, and wound into a roll with

a core hole in the center. It is used for supporting and immobilizing fractured bones and diseased joints. Before usable on the patient, it is immersed in water or other suitable solution, then unrolled and applied wet and allowed to set or harden. Those used in hospitals and dispensaries were made by hand by their employees or patients, principally for economic reasons.

In his application for the patent, Spies does not set forth explicitly the alleged defects in the pertinent art to which his improvement is directed. But, in his enumeration of the benefits to be obtained by his method of constructing the bandage (presently to be quoted), he does by inference point to such imperfections or deficiencies.

The machine made bandages, and some of those made by hand, admittedly were unsatisfactory in certain important particulars. The imperfections known by those whose business it was to apply the bandages, as well as the characteristics desired, were pointed out in published works of persons of admitted skill and authority in the pertinent art. From these it appears:

First, as to the imperfections: If the mesh of the fabric was too fine, an excess of plaster would lie on the layers of the bandage, causing the plaster to set too rapidly and to become brittle. If wound too tightly, or if the layers of the bandage contained too much plaster, the water would not reach the deeper layers, leaving dry lumps or areas. If wound too loosely the bandage, in the handling preparatory to application to the patient, would telescope, i. e., the center would push out at one end, interfering with its easy and prompt use. If the edges were unselvaged, they would fray, hindering the free unrolling of the bandage and interfering with its proper application.

Second, as to suggested improvements: The mesh of the fabric should be $^{28}\!/_{32}$ or $^{28}\!/_{30}$ threads to the square inch; the cloth should never be cut to reduce its width, unless done obliquely; when raveling occurs by tearing the fabric into strips, the edges should be rubbed with the point of a pair of scissors and the ravelings pulled away; the plaster should be rubbed or worked into the meshes and spread evenly in a very thin film on the surface of the layers; and the bandage should be loosely rolled, leaving the concentric layers to move easily on one another, with a core hole of the size of a finger or thumb in the center to avoid creasing and to permit of a rapid and uniform spread of water throughout the entire bandage. See Diseases of the Bones and Joints, by Drs. Joel E. Goldthwait et als. (1909); Plaster of Paris and How to Use It, by Martin W. Ware, M. D. (2d Ed. 1911); Orthopedic and Reconstruction Surgery, by Fred H. Albee, M. D. (1919); Practical Hints on Plaster Casts, by Elsie Tretow, R. N., in the American Journal of Nursing, 1922. This published art was known to both Spies and the defendant. The former admitted having read the above-mentioned works of Drs. Ware and Albee at and before he developed his patented improvement.

In 1922 Dr. Spies examined hospital and commercially manufactured bandages and experimented with them, as he testified, in order "to correlate the difficulties that existed, to standardize the difficulties." In his experiments he came to the conclusion that the tension of the winding should "be as near a uniform one as possible," and "that the edges had to be protected from raveling," also that the core hole "had to be of such a diameter as to allow the water, when the bandage was submerged, to attack the innermost layers from within outward, * * * so that it would tend to a quick and even saturation of the bandage." This diameter he determined should be "about one inch."

Thereupon he constructed by hand a bandage which he considered free from the difficulties found in the bandages then being used, and then, with the assistance of an engineer, he "set out to measure accurately and form a standard in scientific and accurate terms."

In April, 1924, before the clinical society of a named hospital, he gave a demonstration of his bandage, and in September of that year, before the same society, he "read a formal paper embodying all my (his) finished ideas on this plaster of Paris bandage." In the same month he made the application which eventuated in the patent in suit.

Long before Spies took these steps, the defendant experimented to produce a bandage satisfactory to the trade, and from time to time changed both the method of making the bandage and its character. About 1903 it put out a bandage, called "Nu" (corruption of "new"), using a gauze strip of desired width, woven on a special loom by which the warp was interlocked by the woof; i. e., the horizontal threads going over the longitudinal threads in a loop at the edge, making it firm—a selvaged edge. These proved too expensive and were discontinued.

In 1908 and 1909, it put out a crinolin bandage (sized fabric) with a mesh of $^{32}\!/_{28}$ threads to the square inch, carrying an extra

amount of paster, the marketing of which was stopped in 1910.

Prior to 1921 it used a cloth heavier than the average gauze, with a mesh of $32/28$, but mostly the mesh was $44/40$. In its trade circular called "Red Cross Notes," issue of January 24, 1922, is given the amount of plaster and weight of bandage, with instructions for use. In its price list of May, 1921, page 5, it offered hospitals two meshes of crinolin— Red Cross $32/28$ and Bellevue $28/24$—in 100-yard units for their use in making plaster of paris bandages.

For a number of years immediately prior to, and down to and including a part of 1924, it marketed a bandage composed of an unsized cotton cloth having a mesh of $44/40$, which carried plaster of paris in the meshes and between its layers. This, and the more recent of the older styles of bandages made by it, had no selvage. They had a small irregular core hole a little larger than an ordinary pencil. The weight of the average bandage with plaster was 11.78 ounces per square yard, and the weight of the fabric after the plaster was shaken out was 1.36 ounces per square yard.

In 1923 defendant ascertained from the Middlesex General Hospital, New Brunswick, N. J., of which the above-mentioned Dr. Fred H. Albee was the head, how it made its bandages and how it wanted them. They were wound by hand. Thereupon it began experimenting with the construction of a machine to wind them. At first the machine wound them too tightly. Then the tension was reduced and the size of the spindles changed. Finally it adopted the surface winding.

From this recital of the activities of Spies and the defendant, it is evident that the latter began experimenting with machines to produce a bandage that would overcome the published defects referred to and that it was carrying forward some of the suggested improvements before Spies began his experiments.

Turning now to Spies' alleged invention: In his application for patent, he says the "specific objects of the invention are to provide a bandage economical to manufacture commercially, easy for the surgeon to apply and one which will provide the patient with proper support combined with maximum comfort." Lines 14–19, p. 1.

As to the cloth, he specifies: "This is a thin, loosely woven cotton cloth, gauze or scrim sized with starch or some other sizing or stiffening agent, of about $28/32$ to $42/48$ mesh, weighing about $2\frac{1}{2}$ ounces per square yard,

and prepared in standard widths of the number of inches desired for the finished bandages." Lines 30–36, p. 1.

Then, referring to figure 2 of the drawing, he continues: "The basic cloth 1 is woven without a selvage by having the transverse fibers or threads (2) woven in one continuous piece, each of which turns about and around the ultimate longitudinal fibers or threads (3) so that said longitudinal threads will be held in their respective places and prevented from becoming dislodged and thereby separated from the body of the cloth." Lines 38–47, p. 1.

As to the layer of plaster, he says: "At (6) I show a thin layer of dry plaster of Paris which has been ground, rubbed or otherwise forced into the meshes of the cloth so as to constitute a uniformly distributed amount of plaster throughout the bandage, amounting by weight to about $6\frac{3}{4}$ ounces per square yard of cloth." Lines 62–68, p. 1.

As to winding and tension, he says: "The bandage is wound at a particular tension, amounting to about $1\frac{1}{2}$ to $2\frac{1}{2}$ ounces per inch width of cloth." Lines 70–73, p. 1.

And as to the core, he says: "I make the core (8) approximately 1″ in diameter." Lines 73–4, p. 1.

The results to be obtained in a bandage thus made, Dr. Spies declares are:

"Due to the particular cloth used, I produce a bandage free from loose marginal longitudinal threads which make the bandage exceedingly difficult to handle and are a frequent cause of embarrassment to the operating surgeon. The loose threads also afford a difficulty in the making of plaster splints in that their attempted removal ordinarily causes the windings of the bandage to become wrinkled producing extreme discomfort to the patient when the splint is dry and moreover they add to the difficulty of properly moulding the splint to the anatomical part.

"Due to the uniform layer of plaster thoroughly pressed into the cloth I avoid the nonwater permeable characteristics of the bandage with too much plaster, the nonadhesive properties of the bandage with too little plaster, and the lumpy and uncomfortable effect of the bandage combining both defects.

"Due to the particular tension of my bandage in the dry state, I attain the proper degree of water saturation and avoid washing away of the plaster.

"Due to the large core-hole in my bandage I allow a sufficient quantity of water to enter and attack the layers from within out-

ward during the immersion process thereby avoiding an inequality of saturation." Lines 75–105, p. 1, of patent.

Of the five claims, all but the third are involved. Only claim 1 needs to be set out, as it embodies all the features said to constitute the invention. This claim reads:

"A plaster of Paris bandage adapted to be formed into an efficient, comfortable, neat appearing and easily constructed anatomical support for various portions of the human body, comprising, in combination, a loosely woven non-selvage cotton cloth or gauze of $28/32$ to $42/48$ mesh sized with starch or glue and weighing 2 to 3 ounces per square yard, a uniformly distributed layer of dry plaster of Paris amounting to 6 to 7 ounces per square yard of cloth and the cloth and plaster being wound into a completed roll with a tension of 1 to 3 ounces per inch width of cloth with a core hole approximately 1″ in diameter."

It is noticeable that Spies dispensed with none of the basic elements of the old bandages and added no new ones. He had experimented with the old elements or parts of the bandages, and his alleged invention relates to the edges, dimensions of the meshes, weight of the cloth after being sized, amount of plaster, and the method of its distribution, tension of the winding, and the diameter of the core hole. In settling upon the bandage which he sought to patent, he merely took one of the prior art and changed it along the lines pointed out by the authors before mentioned. His patent does not point out any method by which any of the alleged desirable features described and claimed in his patent are to be obtained. This failure in disclosure, even if these features were patentable, would, to my mind, be fatal to the patent. Diamond Rubber Co. v. Consolidated Tire Co., 220 U. S. 428–436, 31 S. Ct. 444, 55 L. Ed. 527. The necessary inference is that the exact methods must be left to the makers of the bandages. The four features of the claims in issue are functionally the same as the prior art taught. It also teaches how to obtain them. The claims do not say that the features which are capable of being measured, shall be of a fixed size, nor that those capable of being weighed should be of a certain weight.

(1) As to the size of the mesh: As noted, the publications referred to recommend a size of $28/30$, or $28/32$ and the record shows that defendant had been making and selling crinolin bandages before 1921 with meshes $24/28$, $28/32$, and $40/44$. Spies admitted that a $28/32$ mesh was well known before the date of his alleged invention.

(2) As to the plaster of paris: Ware and Albee, in the cited works, both show that no more plaster should be rubbed into the meshes than they would hold. And Dr. Goldthwait, in his work in Disease of the Bones and Joints (1909), says: "Whatever method of rolling is employed, the plaster should be worked into the meshes of the crinolin and spread in a very thin film over the surface." Spies, in his testimony on this feature, said: "The ideal amount would be the amount that the carrying cloth would take up within its meshes, and a very thin film covering the threads themselves."

(3) As to the tension in winding the bandage: Albee and Ware, in the works referred to, advise against winding too tightly or too loosely, the former saying: "If too tightly wound and containing too much plaster, it will become 'gummy' with dry spots from uneven penetration of the water; if too loosely wound, it will 'telescope,' i. e., the center pushes out of one end, is flat, awkward of application, and does not take the form of a roller bandage."

The desideration sought in the winding, as here taught by both these authors, and also by Dr. Goldthwait and Miss Tretow, in their respective articles before mentioned, was that the water might have easy access to the plaster and produce a quick and uniform saturation thereof in all turns or layers of the bandage when immersed for that purpose.

(4) As to the core hole: In the Albee and Tretow works referred to, it is stated that in the roll an opening should be left in the center of the bandage, the former specifying one "of the thickness of the finger," and the latter, one "large enough to admit your thumb * * * so that when immersed in water it will have a chance to absorb the necessary amount."

With such disclosures in the prior art, the conclusion seemingly is inevitable that Spies' efforts were directed to confining the size and weight of certain features of the old bandages within a stated minimum and maximum. Whatever the merits of such an improvement, it pertains merely to degree, and does not reach the legal conception of invention. Smith v. Nichols, 88 U. S. (21 Wall.) 112, 118, 119, 22 L. Ed. 566; Atlantic Works v. Brady, 107 U. S. 192, 2 S. Ct. 225, 27 L. Ed. 438; Hollister v. Benedict Manufacturing Co., 113 U. S. 59, 5 S. Ct. 717, 28 L. Ed. 901; Thompson v. Boisselier, 114 U. S. 1, 5 S. Ct. 1042, 29 L. Ed. 76. Also Walker on Patents (5th Ed.) p. 31, and notes appended.

In making a bandage so as to conform to

the teachings of the prior art, differences in the size of the mesh and in the amount of the sticky material used in sizing the fabric, in the amount of the plaster to be used, in the tension exercized in winding the cloth into the roll, and in the diameter of the core hole, were and are bound to occur. The patent by necessary implication recognizes this, and its claimed improvements merely reduce the scope of these variations. One following the teaching of the old art, at times, not to say always, would make bandages which in some of its features would come within the leeway of the sizes and weights set out in the patent's claims. Results thus arising would not be illegal, but a patent covering them is. To sustain the claims of the patent in suit would make an infringer of every nurse, orderly, and patient in hospitals when making bandages in accordance with the practice and methods employed in said hospitals for years before Spies entered the field in question.

The bandages made and sold by the defendant immediately after Spies made his disclosure in 1924 before the clinical society referred to, which disclosure was brought to its attention shortly thereafter, while in several particulars they fall within the leeway of the weights and sizes set forth in some of the claims of the Spies patent, were also as to those features well within the teaching of the prior art. The bandage subsequently made by the defendant differed considerably from those disclosed in the Spies patent.

Inasmuch as the claims of the patent in suit cover only what the prior art taught, which, of course, was open to any maker, vendor, or user, the patent is invalid, and the bill must be dismissed. A decree in accordance with this opinion may be entered.