## HALL LABORATORIES, Inc. v. ECONOMICS LABORATORY, Inc.
### Civil Action No. 722.

District Court, D. Minnesota, Third Division.
May 21, 1947.

Walter J. Blenko and George E. Stebbins, both of Pittsburgh, Pa., and Fred N. Furber, of Fowler, Youngquist, Furber, Taney & Johnson, all of Minneapolis, Minn., for plaintiff.

Roger T. McLean, Frank E. Barrows, and W. Brown Morton, Jr., of Pennie, Edmonds, Morton & Barrows, all of New York City, and Montreville J. Brown, of Oppenheimer, Hodgson, Brown, Donnelly & Baer, all of St. Paul, Minn., for defendant.

DONOVAN, District Judge.

This is a suit for infringement of claim 28 of Hall Patent No. 19,719, hereinafter referred to as 719, and claim 10 of Hall Patent No. 2,035,652, hereinafter referred to as 652. Plaintiff seeks injunctive relief against defendant, together with an accounting.

Defendant denies that it committed acts of infringement, and alleges that said patents, and each of them, are invalid.

Patent 719 consists of a composition for softening hard water. Patent 652 is a dishwashing compound. Title to both patents

is in plaintiff by assignment, and the products of the claimed inventions have been made available to the public under the trade names of "Calgon" for water-softening purposes, and "Calgonite" for dishwashing.

The two claims we are here concerned with read as follows:

719, Claim 28—"A washing composition comprising an alkali-metal metaphosphate which is water soluble and capable of sequestering calcium in a but slightly ionized condition and a deflocculative detergent capable of peptizing greases."

652, Claim 10—"A washing composition for cleansing greasy articles, containing an alkali-metal saponifying detergent and sodium hexametaphosphate, the alkali-metal saponifying detergent being in amount sufficient to produce in aqueous solution a highly alkaline solution having a pH value of at least 10.5, the sodium hexametaphosphate being in amount sufficient to prevent the precipitation of calcium soap in the washing of greasy articles in such highly alkaline solution."

The products of said claims will be referred to as plaintiff's compounds or compositions.

Said patents described methods of water softening and preventing the precipitation of calcium in the manner outlined in the above-quoted claims. It is conceded that hard water is caused almost entirely by the presence therein of calcium and calcium salts. Iron, silica, aluminum and like salts may also be present, and contribute to water hardness, but only in minor proportions.

. Plaintiff corporation, together with The Buromin Company and Calgon, Inc., are entirely owned by Hagan Corporation. The parent company was organized in 1918. Defendant company was organized in 1925. The Buromin Company was organized in 1931, and Calgon, Inc., was organized in 1934. It is undisputed that plaintiff and its related companies, i. e., Hagan Corporation, The Buromin Company, and Calgon, Inc., have been closely associated in the promotion and marketing of glassy phosphate material variously described as "Calgon," "Hagan Phosphate," and "Buromin." The first two are identical. Plaintiff entered into a series of agreements with Chemische Fabrik Joh. Benckiser, of Germany, Swann Chemical Company, Victor Chemical Works, Albright and Wilson, Limited, Charlotte Chemical Laboratories, Monsanto Chemical Company, and Rumford Chemical Works, and thereby, in effect, controlled the products of the two patents here involved to such an extent that the only remaining source of supply of glassy phosphates was the Blockson Chemical Company.

John M. Hopwood, President of Hall Laboratories, Inc., testifying for plaintiff, provides a graphic visualization of the method of water-softening prior to the patenting of the methods here in suit, as follows:

"I became acquainted with water softening many years before by association with the Hagan Corporation. I was in charge of a number of mines and at nearly all of those mines we had to use softening plants. By a softening plant, I mean a plant that we precipitated the hardness by the introduction of lime and soda ash. Then we filtered off the precipitated sludge and used the clear water for treating our boilers. I also, of course, had the ordinary common knowledge that I believe all of us have with the packaged water softeners used up until that time. * * *"

As to the commercial water softening methods up to 1932:

"Distillation I would say was the first, where you generate steam and then condense the steam to water, and then use that water as distilled water. Next would be the treatment of water with the different chemicals available for precipitating, so that you got now the hardness precipated. You do that with your own city water system, and you produce a water that is too alkaline to drink, so you acidify it and bring the pH to a point where it is harmless for drinking purposes.

"Then the zeolite system, base exchange system, which was invented, I believe, by Gans about forty years ago. I was quite familiar with that.

"Then the next system that I am familiar with was discovered some forty years later, the system of Hall's whereby the housewife could take a packaged product for the first

time in her life and for the first time, I think, in the history of the world, take a packaged product, sprinkle a little of that product in water and produce any type of softening that she desired without a sign of sludge, or without increasing its alkalinity one iota."

The Hall method leading to patents 719 and 652 came about, according to the testimony of Mr. Hopwood, when the patentee approached him with information that he had discovered a new use for Hagan Phosphate. Hall advised Hopwood that said phosphate could be used as a water softener, and proceeded to demonstrate his thesis by taking two flasks of Pittsburgh water (considered hard), pouring liquid Buromin (plaintiff's glass product dissolved in said water) into one flask, and leaving the other flask "just at it was." Into each flask Hall then added the same amount of soap. The result was described by Mr. Hopwood as follows:

"The flask containing the metaphosphate when taken up just sudsed copiously. There was no precipitate in it. It was just a clear crystal water with several inches of soap suds on the top of it. The water that had not received the small quantity of liquid phosphate, Hagan Phosphate, just got milky and there was not a sign of any soap sud in it. * * * I could see, or I thought I could, a future for this material that was beyond anything that we had ever imagined as coming to us from our then established business. I could see the hundreds of thousands, the millions of packages of water softening products that were sold in every store in the United States, every drug store and every grocery store in the United States. * * * These packaged water softeners, consisting of trisodium phosphate by various names—calcium carbonate—by different names, and the different products like washing soda and things of that kind that were sold for softening water. * * *"

The patents here in suit were applied for and issued to Ralph E. Hall, and in due course were assigned to plaintiff. It may be not entirely accurate, but will contribute to simplicity, to say that the products of the patents arise out of a process of melting mixtures of sodium metaphosphate and sodium pyrophosphate, and then quickly cooling the molten matter thus obtained. The result is a glassy material, such as herein referred to as commercial Calgon. (See bottle 3, exhibit 7.)

In the words of the patentee, "the teaching of * * * [the] patent is the sequestering or tying up of the calcium in water soluble complex." As a consequence, the precipitation of the calcium is hindered or repressed by addition of material which might normally make it insoluble. In other words, the calcium is held in solution in a manner not entirely clear or understandable.

For many years, preceding Hall's discovery, a glassy product known as Graham's salt, or sodium hexametaphosphate, had been known to all familiar with the science of chemistry. The term, sodium hexametaphosphate, was applied to such glassy material in 1898 by Fleitmann and Henneberg. Long prior thereto, Fresenius, in his text, tells how—

"The precipitation of calcium by alkali-metal carbonates is completely prevented or rendered very incomplete by the presence of citrates (Spiller) or alkali-metal metaphosphates (Rube).

"Alkali-metal citrates and metaphosphates prevent or render incomplete the precipitation of calcium by alkali-metal oxalates."

The last quotation, in effect, describes a then recognized interference with, or repression of, or hindering of, the precipitation a chemist would ordinarily expect on adding a carbonate.

The file wrappers in evidence disclose the prior patents considered by the Examiner in the Patent Office. The Fresenius text is not listed among them.

The patents in suit do not specifically refer to "glassy phosphates", but plaintiff claims the patents give it the exclusive right to the use of glassy phosphates during the life of the patents. The term "glassy phosphates" covers a wide range. There are a large number of metal metaphosphates. Mellor lists about fifty of them. It appears from plaintiff's evidence that the only one

useful for the purposes of the patents was sodium hexametaphosphate.

The glassy material used by defendant is manufactured by Blockson Chemical Company, which company plaintiff refers to in this case as an "unlicensed source." The record suggests that Blockson's glass is a fused mixture of sodium metaphosphate and sodium pyrophosphate. In the case at bar we are particularly concerned with "metaphosphate" and "hexametaphosphate." As pointed out, Mellor, describing many of them, includes hexametaphosphate in his list.

Defendant has been engaged in manufacturing cleansing products and marketing a compound known by the trade name of "Soilax" for a number of years before patents 719 and 652 came into being. Soilax, containing trisodium phosphate, together with another chemical, when added to water, has a tendency to liberate alkali and remove film from soiled dishes. It is used for other purposes, also. It appears that Soilax was not all to be wished for. It contained no glassy phosphate. Learning of plaintiff's products, manufactured pursuant to the patents here in suit, defendant's executive officers journeyed to Pittsburgh for the purpose of obtaining the exclusive selling agency of Calgon and Calgonite. A tentative agreement to that end followed, and in March, 1937, was terminated by mutual consent of the parties. Subsequently, defendant came into the market with its "Super Soilax" and "Torrance compound." There is no dispute in the case but that defendant's Super Soilax and Torrance compound are produced from Blockson glass, sodium metasilicate, and sodium carbonate in the proportions hereinafter set forth.

The approximate compositions of defendant's accused products, as claimed by plaintiff, are as follows:

| Super Soilax: | Blockston glass | 25% |
| | Sodium metasilicate | 40% |
| | Sodium carbonate | 35% |
| Torrance compound: | Blockston glass | 40% |
| | Sodium metasilicate | 30% |
| | Sodium carbonate | 30% |

Plaintiff contends that defendant's compositions above set forth, together with defendant's advertising and sales talk, constitute infringement of claim 28 of patent 719 and claim 10 of patent 652.

Denying infringement, and challenging the validity of said patents, defendant's evidence was to the effect that the Blockson glass is not "an alkali-metal metaphosphate" as required by claim 28 of patent 719, nor "sodium hexametaphosphate" as required by claim 10 of patent 652, but on the contrary is a substance described as "decophosphate".

The questions presented, in the order of their importance, are as follows:

(1) Are the patents in suit valid?

(2) If valid, have either or both been infringed?

(3) If valid and infringed,

(a) Should injunctive relief and an accounting be granted plaintiff, or

(b) Should the doctrine of estoppel prevent plaintiff from recovering under well-established principles of equity?

Defendant attacks the validity of the patents, claiming they lack invention; that they were anticipated; that disclosure was insufficient, indefinite and functional; that they are void because the owner failed to disclaim; and that they are void because of double patenting.

The controlling statutes provide:

35 U.S.C. 31, 35 U.S.C.A. § 31, Sec. 4886 R.S.—"Any person who has invented or discovered any new and useful * * * composition of matter, or any new and useful improvements thereof, * * * not known or used by others in this country, before his invention or discovery thereof, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof, or more than one year prior to his application, and not in public use or on sale in this country for more than one year prior to his application, unless the same is proved to have been abandoned, may, upon payment of the fees required by law, and other due proceeding had, obtain a patent therefor."

35 U.S.C. 33, 35 U.S.C.A. § 33, Sec. 4888 R.S.—"Before any inventor or discoverer shall receive a patent for his in-

vention or discovery he shall make application therefor, in writing, to the Commissioner of Patents, and shall file in the Patent Office a written description of the same, and of the manner and process of * * * compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to * * compound, and use the same; * * * and he shall particularly point out and distinctly claim the * * * combination which he claims as his invention or discovery."

Do patents 719 and 652 contribute to the art a "new and useful * * * composition * * * not known or used by others * * * or described in any printed publication in this or any foreign country * * *"? Do the claims here in controversy and as filed in the Patent Office contain "a written description of the same * * * in such full, clear, concise, and exact terms as to enable any person skilled in the art * * * to * * * compound and use the same"? These cogent questions go to the very heart of the contest submitted to the trial court in a record of 835 pages disclosing great industry in preparation for trial and a most discriminating choice of learned witnesses whose testimony reflects profound chemical knowledge, unfolding to the court marvels of the science they excel in, and discussing chemistry as related to the subject-matter in hand, from "ions * * * [to] Maxwell's demon." The very complete oral arguments and briefs of able counsel have been immeasurably helpful to the court.

■■ Are the patents in suit valid? It is elementary law that the validity of a patent is presumed, and such presumption can only be overcome by clear and satisfactory proof. The burden of proving the patents in suit void, of course, rests upon the defendant, and every reasonable doubt should be resolved in favor of the patent. Donner v. Sheer Pharmacal Corporation, 8 Cir., 64 F.2d 217; Wisconsin Alumni Research Foundation v. George A. Breon & Co., Inc., 8 Cir., 85 F.2d 166.

■ Regardless of the high standing of the patentee in his chosen profession and his reputation and renown as a great scientist, to whom defendant and leaders in science paid public tribute for his outstanding achievments in water-softening and saponifying detergents, as outlined in the claims first above quoted, the subject matter of each of the patents must reveal invention, lacking which they would be void ab initio. Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S. Ct. 37, 86 L.Ed. 58; Sinclair & Carroll Co. Inc. v. Interchemical Corporation, 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644.

■ Of primary importance is the question of invention: Did Dr. Hall's discovery advance the art sufficiently to constitute invention? Utility, novelty and commercial success, alone or combined, are insufficient, if what the patentee teaches the industry is merely an adaptation of an old process to a new use. Nor is it permitted to base the quoted claims on the teaching of prior patents and uses of which Dr. Hall had knowledge. The last step to perfect a compound or composition such as those here in suit is not alone sufficient. Judge Sanborn emphasizes this in Koochook Co., Inc., et al. v. Barrett et al., 8 Cir., 158 F.2d 463, 466, in the following manner:

"We think that Barrett's contribution can not be held to constitute invention in the light of Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58. That case involved the Mead patent No. 1,736,544 relating to improvements in lighters for cigars and cigarettes. Mead, in effect, took the last step to perfect a cigarette and cigar lighter for use in automobiles—just as Barrett took the last step to perfect a type of tool, known to the prior art, by using in connection with it a disk-type grinder, old in the art. The Supreme Court, while conceding that the functions performed by Mead's combination were new and useful, ruled that they did not constitute an invention or discovery. The court said (pages 90–92 of 314 U.S., pp. 40, 41 of 62 S.Ct.): 'We may concede that the functions performed by Mead's combination were new and useful. But that does not

necessarily make the device patentable. Under the statute 35 U.S.C. § 31, 35 U.S.C.A. § 31, R.S. § 4886, the device must not only be "new and useful", it must also be an "invention" or "discovery". Thompson v. Boisselier, 114 U.S. 1, 11, 5 S.Ct. 1042, 1047, 29 L.Ed. 76. Since Hotchkiss v. Greenwood, 11 How. 248, 267, 13 L.Ed. 683, decided in 1851, it has been recognized that if an improvement is to obtain the privileged position of a patent more ingenuity must be involved than the work of a mechanic skilled in the art. Hicks v. Kelsey, 18 Wall. 670, 21 L.Ed. 852; Slawson v. Grand Street R. Co., 107 U.S. 649, 17 Otto 649, 2 S.Ct. 663, 27 L.Ed. 576; Phillips v. Detroit, 111 U.S. 604, 4 S.Ct. 580, 28 L.Ed. 532; Morris v. McMillin, 112 U.S. 244, 5 S.Ct. 218, 28 L.Ed. 702; Saranac Automatic Machine Corp. v. Wirebounds Patents Co., 282 U.S. 704, 51 S.Ct. 232, 75 L.Ed. 634; Honolulu Oil Corp. v. Halliburton, 306 U.S. 550, 59 S.Ct. 662, 83 L.Ed. 980. "Perfection of workmanship, however much it may increase the convenience, extend the use, or diminish expense, is not patentable." Reckendorfer v. Faber, 92 U.S. 347, 2 Otto 347, 356, 357, 23 L.Ed. 719. The principle of the Hotchkiss case applies to the adaptation or combination of old or well known devices for new uses. Phillips v. Detroit, supra; Concrete Appliances Co. v. Gomery, supra (269 U.S. 177, 46 S.Ct. 42, 70 L.Ed. 222); Powers-Kennedy Contracting Corp. v. Concrete Mixing & Conveying Co., supra (282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278); Electric Cable Joint Co. v. Brooklyn Edison Co., 292 U.S. 69, 54 S.Ct. 586, 78 L.Ed. 1131; Altoona Publix Theatres, Inc. v. American Tri-Ergon Corp., supra (294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005); Textile Machine Works v. Louis Hirsch Textile Machines, Inc., 302 U.S. 490, 58 S.Ct. 291, 82 L.Ed. 382; Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334. That is to say the new device, however useful it may be, must reveal the flash of creative genius, not merely the skill of the calling. If it fails, it has not established its right to a private grant on the public domain.

" 'Tested by that principle Mead's device was not patentable. We cannot conclude that his skill in making this contribution reached the level of inventive genius which the Constitution, Art. I, § 8, authorizes Congress to reward. He merely incorporated the well-known thermostat into the old "wireless" lighter to produce a more efficient, useful and convenient article. Cf. Electric Cable Joint Co. v. Brooklyn Edison Co., supra. A new application of an old device may not be patented if the "result claimed as new is the same in character as the original result" (Blake v. San Francisco, 113 U.S. 679, 683, 5 S.Ct. 692, 694, 28 L.Ed. 1070), even though the new result had not before been contemplated. Pennsylvania R. Co. v. Locomotive Engine Safety Truck Co., 110 U.S. 490, 494, 4 S.Ct. 220, 222, 28 L.Ed. 222, and cases cited. Certainly, the use of a thermostat to break a circuit in a "wireless" cigar lighter is analogous to or the same in character as the use of such a device in electric heaters, toasters, or irons, whatever may be the difference in detail of design. Ingenuity was required to effect the adaptation, but no more than that to be expected of a mechanic skilled in the art.'

"See and compare, also, Freeman v. Altvater, 8 Cir., 138 F.2d 854, 861; Frank Adam Electric Co. v. Colt's Patent Fire Arms Mfg. Co., 8 Cir., 148 F.2d 497, 502; Picard v. United Aircraft Corporation, 2 Cir., 128 F.2d 632, 636."

The Eighth Circuit Court of Appeals, mindful of "the trend of the decisions of the Supreme Court in recent years," in Gardner v. Buxton, Inc., 150 F.2d 242, points out, at page 243, that:

"The Supreme Court has only recently again emphasized that 'He who is merely the first to utilize the existing fund of public knowledge for new and obvious purposes must be satisfied with whatever fame, personal satisfaction or commercial success he may be able to achieve. Patent monopolies, with all their significant economic and social consequences, are not reserved for those who contribute so insubstantially to that fund of public knowledge.' Dow Chemical Co. v. Halliburton Oil Well

Cementing Co. [324 U.S. 320], 65 S.Ct. 647, 650 [89 L.Ed. 973]."

In other words, as suggested by the dissenting opinion in MacGregor et al. v. Westinghouse Electric & Manufacturing Co. et al, 67 S.Ct. 421, 424, 427, "* * * whether an inventor has a valid patent is a matter of increasing uncertainty." See also: Pennsylvania R. Co. v. Locomotive Engine Safety Truck Co., 110 U.S. 490, 4 S.Ct. 220, 28 L.Ed. 222; Thompson v. Boisselier, 114 U.S. 1, 5 S.Ct. 1042, 29 L.Ed. 76; Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 20 S.Ct. 708, 44 L.Ed. 856; General Electric Co. v. Jewel Co., 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43; Halliburton Oil Well Cementing Co. v. Walker, et al., 329 U.S. 1, 67 S.Ct. 6.

██ The point made by defendant that the patents in suit were anticipated, in my opinion, is well taken. Searching the record to preserve the presumption of validity leads to the conclusion that no demonstrable distinction exists between the discoveries made by Dr. Hall and those published in the quoted text of Fresenius, supra, disclosing how "the precipitation of calcium by alkali-metal carbonates is completely prevented * * * by the presence of citrates (Spiller) or alkali-metal metaphosphates (Rube)." What Fresenius gave expression to in his textbook on quantitative chemical analysis was, without doubt, written with no thought to commercial success. Nonetheless, Fresenius, in my opinion, thereby published the principle litigated in the instant case. The wheel of the oxcart or chariot in the days of ancient Egypt anticipated the principle that makes possible the wheels of our present-day streamlined trains and airplanes. It is the same device put to a new use. So, in the case now before the court, the Fresenius principle expressed by the words "precipitation * * * prevented" and that claimed by Dr. Hall, i. e., "sequestering calcium," or "to prevent the precipitation of calcium soap," seems so obviously analogous that I must conclude the patents in suit were anticipated and for that reason are invalid. Old Town Ribbon Co. v. Columbia Ribbon Mfg. Co., 2 Cir., 159 F.2d 379.

To attempt differentiation between "sequestering calcium" on the one hand as claimed by plaintiff's patents, and the quotation from Fresenius last above set forth on the other hand, is, at best, but a play of words. It is also significant that the file wrappers of the patents in suit make no mention of the Fresenius text. Under the circumstances, it cannot be said that all the prior art was considered to determine an advance in such art by the specifications of the patents in suit to the extent of disclosing "invention".

██ It appears to me that the descriptions used are inadequate. The patents in suit are for compositions. They are made up of chemical combinations of materials long known and used in the science of chemistry. As used in the claims, they are not in my opinion expressed with the clearness and precision required by the governing statutes, leaving one who might attempt to use the discovery to find it out by experiment. Claims may not be broadened in terms of function. Wood v. Underhill, et al., 5 How. 1, 46 U.S. 1, 12 L. Ed. 23; Tyler v. Boston, 7 Wall. 327, 74 U.S. 327, 19 L.Ed. 93; Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 48 S.Ct. 474, 72 L.Ed. 868; General Electric Co. v. Wabash Appliance Corp., et al., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402; Halliburton, etc. v. Walker, et al., supra; Zenitherm Co., Inc. v. Art Marble Co., 5 Cir., 56 F.2d 39; Libbey-Owens-Ford Glass Co. v. Celanese Corp., 6 Cir., 135 F.2d 138.

The court finds the patents in suit invalid for the reasons above outlined. This makes unnecessary any further consideration of the remaining points raised by pleading, proof and argument.

Concluding, I wish to compliment counsel on both sides of the case for the lawyer-like manner in which they presented their evidence, and for their courtesy to the court and to each other. That plaintiff did not prevail is no reflection on the sincerity of the witnesses participating, nor does the conclusion arrived at detract from the obvious learning and ability of counsel for the plaintiff. The result reached is but

690

an earnest effort to do justice, according to the best lights of the court.

Defendant may submit findings of fact, conclusions of law, order for, and judgment of dismissal, consistent with the foregoing.

An exception is accorded to the plaintiff.