**HALL LABORATORIES, Inc. et al.**

v.

**NATIONAL ALUMINATE CORP.**

**Civ. A. No. 1192.**

United States District Court
D. Delaware.

March 24, 1954.

---

Aaron Finger, of Richards, Layton & Finger, Wilmington, Del., Walter J. Blenko and Eugene F. Buell, of Blenko, Hoopes, Leonard & Glenn, and James K. Everhart, Jr., Pittsburgh, Pa., for plaintiffs.

Arthur G. Connolly, of Connolly, Cooch & Bove, Wilmington, Del., John T. Chadwell, Richard L. Johnston and Victor P. Kayser, Chicago, Ill., for defendant.

LEAHY, Chief Judge.

The complaint is for declaratory judgment by plaintiffs who are four corporations under the same management, against defendant, National Aluminate Corporation, which owns U. S. Patent 2,358,222, known as the Fink-Richardson patent, relating to the art of treating water. Plaintiffs seek a judgment declaring plaintiffs are relieved of their obligations under the non-exclusive and non-transferable license under the patent, granted to them by Nalco on January 29, 1948.

The license agreement [1] was part of a settlement of previous litigation between the parties in this court. In the earlier litigation, Buromin Co. v. National Aluminate Corp., D.C., 70 F.Supp. 214, our C.A. 538, plaintiffs on March 17, 1945, filed a declaratory judgment action [2] claiming invalidity and non-infringement of the Fink-Richardson patent.[3] An answer and counterclaim [4] and a reply [5] were filed. Plaintiffs took depositions in Chicago, San Francisco, and far up in the Sierra Nevada Mountains east of Sacramento, California. Defendant took several hundred pages of depositions in Pittsburgh. Plaintiffs served notice to take depositions in Texas which were not taken because of the settlement of the case. Settlement negotiations were entered into, and a settlement was reached in January 1948, which included, inter alia, the license agreement, an agreement with respect to release of past infringement,[6] a covenant not to sue [7] and the entry on February 10, 1948, of an agreed judgment of dismissal of the complaint and counterclaim, entitled "Final Judgment",[8] containing the recital counsel had represented to the court "that the parties hereto have compromised and settled this controversy, and the defendant has granted a license to the plaintiffs under Fink and Richardson patent No. 2,358,222."

Fink-Richardson patent 2,358,222 relates to treatment of hard or incrusting water with small amounts of polyphosphoric acid compounds to prevent incrustation, the process being known as "stabilization". Certain claims of the patent, for example, claims 18 and 19, are directed toward the use of 1 to 3 and not more than 9 ppm of polyphosphate in the treatment of water.[9]

Plaintiffs' practices are defined in recital (a) of the license agreement entered into by the parties on January 29, 1948 and provides "incrusting water be treated with a polyphosphoric acid compound by adding it to the water in minute amounts, usually of the order of one to three parts per million, and sometimes in amounts up to about nine parts per million."

After making three quarterly royalty payments under the license, plaintiffs brought this second declaratory judgment action to avoid the payment of further royalties on the purported basis there had been a change of "circumstances", or a "new situation", created since the execution of the license agreement by reason of a judicial interpreta-

---

1. Complaint Ex. A.

2. DX 7.

3. DX 6.

4. DX 8.

5. DX 9.

6. DX 4.

7. DX 5.

8. DX 6.

9. The abbreviation "ppm" refers to parts per million, for example, 1 to 9 ppm of polyphosphate added to hard water (plaintiffs' practices) means one million pounds of treated water will contain 1 to 9 pounds, respectively, of the polyphosphate.

tion based upon the teachings appearing in an early chemical textbook by a chemist named Fresenius.[10]

The litigation was an infringement suit brought by Hall Laboratories (one of the plaintiffs herein) against Economics Laboratory, involving the Hall reissue patent 19,719 [11] and another patent, both owned by plaintiffs and both relating to water softening, the process being known as "sequestration". The decision of the trial court was the Hall reissue patent was anticipated by the Fresenius text.[12] This was more than six months prior to the settlement of plaintiffs' first case against Nalco in this court.

The Court of Appeals affirmed in its entirety the decision of the trial court. 8 Cir., 169 F.2d 65.

Defendant Nalco here was not a party to the Economics litigation and the Fink-Richardson patent [13] was in no way involved there. The Economics litigation involved solely patents relating to water softening, i. e., sequestration, and did not involve any patents or practices relating to stabilization, which is the subject of Fink-Richardson. Plaintiffs conceded the Hall patent differs from the Fink-Richardson patent.[14] The Hall patent was held invalid in the Economics case on the ground there was "no demonstrable distinction" [15] between the patent and the Fresenius text, but the validity of the Fink-Richardson patent was in no way involved.

Despite plaintiffs' knowledge of the Fresenius text and the judicial interpretation which had been placed upon it by the trial court for over six months prior to the time of the compromise and settlement of their previous suit against Nalco, they did not plead it. The so-called "new situation" upon which they relied in their pending complaint in asking this court to relieve them of their obligations under their license agreement was solely the fact the Eighth Circuit had affirmed the decision of the District Court in the Economics case in its entirety. They claim this affirmance of the decision of the court below, not involving the Fink-Richardson patent, constituted an "eviction" from the benefits of their license agreement under the Fink-Richardson patent; their practices are now "justified by the art" as it existed prior to Fink-Richardson; and they should be held to be no longer liable under the license agreement.

Defendant Nalco filed a motion for summary judgment to dismiss the pending complaint with prejudice because:

1. Paragraphs 8 and 9 of the license agreement (Exhibit A to the complaint) set forth the sole conditions under which plaintiffs may be relieved of their obligations to pay royalties and since these conditions have not occurred, plaintiffs cannot prevail on their complaint.

2. Plaintiffs are liable to pay royalties under the license agreement irrespective of the prior art because the processes they admittedly use are the same as those described in the license agreement on the basis of the use of which they agreed to pay royalties.

3. Plaintiffs' past royalty payments bar them from denying liability for future payments on account of the same activities.

4. Plaintiffs will not be permitted to relitigate the same issues compromised and settled in the previous litigation.

5. Entirely aside from the terms of the license agreement, plaintiffs have not been evicted from the benefits of the license agreement.

In my opinion of September 20, 1950, I suggested the doctrine of Scott Paper Co. v. Marcalus Co., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47, relied upon by

10. Hereinafter called the "Fresenius text", pages 139 to 144 of which appear as Exhibit D to the complaint.

11. PX 4.

12. D.C.Minn., 72 F.Supp. 683.

13. PX 6.

14. Complaint par. 7, 3rd sub-par.

15. 72 F.Supp. 689.

plaintiffs in their brief in opposition to the motion, did not apply here, but I did not finally rule on the question and observed by denying the motion for summary judgment "there will be present at trial live and informed testimony or other evidence placing plaintiffs' practices vis-a-vis the Fresenius text".[16]

Defendant Nalco filed its answer and affirmative defenses on October 19, 1950. On November 1, 1950, Nalco filed a motion under Fed.Rules Civ.Proc. rule 42(b), 28 U.S.C., for an order setting for separate trial, prior to the other issues raised by the pleadings, the single issue as to the identity of plaintiffs' practices and the Fresenius text.

This court on January 22, 1951,[17] granted Nalco's motion under F.R. 42 (b) and held: plaintiffs "should not be permitted to forget the prior litigation between the parties in this Court" which was compromised and settled; "plaintiffs should not be permitted to retry in another round of litigation all of those issues which they had raised in their prior declaratory judgment action", including the prior art cited in the previous action and in the present action of which plaintiffs had full knowledge for many years prior to the settlement of the former litigation; "there has been survival of the doctrine of estoppel against a patent licensee to contest validity of the licensed patent" which was definitely resolved and reaffirmed by the Supreme Court in Automatic Radio Mfg. Co., Inc. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312, and a separate trial should be held on the single issue relative to Fresenius. I also held "if it so develops on this issue the decision is in favor of plaintiffs, then the parties can proceed on any other issues which could be said to remain, and which the court will decide could remain. If the decision on this issue is in favor of defendant, this would seem to end the cause in this court".[18]

The order of this court was entered February 12, 1951, granting defendant's motion for a separate trial under F.R. 42(b) "upon the single issue as to whether or not plaintiffs' practices correspond with the teachings of the Fresenius text."

Findings of Fact

1. This is a civil action seeking a declaratory judgment of non-infringement.

2. Defendant is owner of Fink-Richardson patent 2,358,222 issued on September 12, 1944 under which plaintiffs are licensed by virtue of an agreement dated January 29, 1948, entered into as a part of a compromise and settlement of earlier litigation in this court with respect to the same patent between the same parties, C.A. 538, 70 F.Supp. 214.

3. In the earlier litigation, plaintiffs sought a declaratory judgment the Fink-Richardson patent was invalid and not infringed by their practices sometimes referred to as the threshold treatment and called the "stabilization treatment" of industrial waters in view of various items of prior cited art. A final judgment reciting the parties had compromised and settled the suit and defendant had granted a license to plaintiffs under defendant's patent was entered by this court on February 10, 1948. Plaintiffs made three quarterly royalty payments under the license agreement before bringing the instant action.

4. Plaintiffs' practices in the "stabilization treatment" are defined in the license agreement as the addition of polyphosphoric acid compounds to incrusting water in minute amounts, usually of the order of 1 to 3 ppm (parts per million) and sometimes in amounts up to about 9 ppm. In their practices, plaintiffs use a chemical "sodium metaphosphate" which is a polyphosphoric acid compound. The limits of 1 to 9 ppm are specifically recited in claims of the Fink-Richardson patent, particularly claims 18 and 19.

16. D.C.Del., 93 F.Supp. 376, 379–80.

17. D.C.Del., 95 F.Supp. 323, 326.

18. D.C.Del., 95 F.Supp. 326.

5. By the instant declaratory judgment action, plaintiffs seek to avoid the obligation to pay royalty under the license agreement of January 29, 1948, on the ground the decision by the Court of Appeals in the Eighth Circuit affirming a decision of the District Court in an infringement suit, Hall v. Economics Laboratories, Inc., D.C.Minn., 72 F.Supp. 683, affirmed in toto, 8 Cir., 1948, 169 F.2d 65, on a patent owned by plaintiffs known as the "Hall patent" reissue 19,719, "created a new situation". Plaintiffs' stabilization practices have not changed. They are the same as the practices defined in the license agreement. The Hall patent relates to a different subject matter, namely the softening of water against soap hardness by adding to the water relatively large amounts of sodium metaphosphate to cause sequestration of the calcium and other hardness components of the water so they will not react chemically and precipitate when soap is added. The stabilization practices have no significant effect on the hardness of the water. The sole ground for the alleged "new situation" is the interpretation placed by the Court in the Economics case on the disclosure of the chemical textbook by Fresenius "The System of Instruction in Quantitative Chemical Analysis".

6. At the time plaintiffs entered into the license agreement of January 29, 1948, they knew about the Fresenius text and the District Court in the Economics case had already held the Hall patent Reissue 19,719 invalid in view of the Fresenius text.

7. Defendant filed a motion for summary judgment which I denied on the ground it was desirable to have a trial to consider plaintiffs' practices vis-a-vis the Fresenius text, D.C.Del., 93 F.Supp. 376. The separate trial under F.R. 42 (b) on the single issue of whether or not plaintiffs' practices correspond with the Fresenius text was ordered by the court, D.C.Del., 95 F.Supp. 323. The instant findings of fact are entered on the trial of that issue.

8. The purpose of plaintiffs' practices is to prevent incrustation on feed lines carrying hard or incrusting waters. Incrustation is the deposition and adherence of solid substances such as calcium compounds from the water onto the walls of the pipe or vessel carrying or containing the water. The formation of incrustation is common where hard waters are employed in municipal or industrial uses, particularly in hot water feed lines and cooling water lines. Heating the water and the presence of alkalis increase the tendency toward incrustation and if the incrustation is not prevented the pipelines carrying the water eventually become clogged and are rendered inoperable.

9. The stabilization treatment covered by the Fink-Richardson patent involves adding a minute amount of polyphosphoric acid compound to hard or incrusting waters, usually in the range of 1 to 3 and not more than 9 ppm. The amount added is sufficient to prevent incrustation but has no significant effect in softening the water. The 1–9 ppm quantity is not conditioned upon the hardness of the water. The phenomenon is quite different from sequestration claimed in the Hall patent Reissue 19,-719 where water is softened and the calcium and other hardness components present in the water are tied up in the form of a chemical complex. If more than 9 ppm of sodium metaphosphate are added to a hard water containing calcium, a precipitation of calcium metaphosphate occurs which is incrusting and in the range above about 9 parts per million and below about 2000 parts per million the sodium metaphosphate does not prevent incrustation. Beginning around 2000 parts per million, and depending upon the amount of calcium present in the water, sequestration occurs and all precipitation of calcium is prevented. In certain cases, plaintiffs use up to about 40 parts per million of sodium metaphosphate in the treatment of oil well brines containing barium sulfate and they refer to these practices

as stabilization but such practices are not within the scope of plaintiffs' practices outlined in the license agreement and constitute only 5% of plaintiffs' alleged stabilization practices. They are irrelevant to the plaintiffs' practices involved in this case.

10. Plaintiffs' practices do not correspond to the Fresenius text. The Fresenius text does not relate to the prevention of incrustation in hard waters, but relates to the quantitative analysis of chemical solutions to determine the quantity of a particular constituent present in such solutions. These solutions are analyzed by adding a chemical to a solution containing a particular constituent in order to bring about precipitation of a compound of the constituent, which is then dried, weighed and the quantity then computed. It is essential all of the desired constituent be precipitated because otherwise the computation would be inaccurate. In the portions of the Fresenius text relied upon by plaintiffs, Fresenius warns certain substances including metaphosphates interfere with the precipitation and must be removed in order to secure a complete precipitation. Fresenius does not teach the addition of metaphosphates for any purpose nor mention anywhere in his text any amounts of metaphosphate which might interfere with precipitation of incrusting deposits. He does not teach the addition of 1 to 9 ppm of metaphosphate will prevent incrustation in hard waters. In his general statements with respect to metaphosphates Fresenius refers to Scheerer and Rube indicating he is relying upon these people as his authority for his statement. The article by Scheerer entitled: "An Unusual Case in Which Baryta Is Not, or Not Completely, Precipitated by Sulfuric Acid" (PX 3), was of record in the Economics case and describes some experiments by Rube involving the use of 1590 to 8450 ppm of sodium metaphosphate. The experiments specifically reported relate to precipitation of barium compounds such as barium sulfate and the article states calcium and strontium compounds behave in a similar manner. There is no evidence in the Fresenius text or in any of the authorities relied upon by Fresenius of the use of 1 to 9 ppm of a polyphosphoric acid compound for any purpose. Rube's experiments reported by Scheerer show although sodium metaphosphate interferes with the precipitation of barium sulfate it does not completely prevent it. In fact, Rube obtained relatively large amounts of precipitate. Furthermore, Rube observed a maximum interference with precipitation at about 3000 ppm and as the amount of sodium metaphosphate was increased beyond 3000 ppm the amount of precipitate likewise increased. The same was true when the amount of metaphosphate was decreased below 3000 ppm. In short, the amount of interference with precipitation decreased as the amount of metaphosphate used was decreased. It is logical to conclude as the amount of sodium metaphosphate is further decreased, the amount of interference with precipitation would also decrease under the conditions reported by Scheerer. Hence, the evidence demonstrates a chemist reading Scheerer would assume there is no interference with precipitation of barium sulfate in the low range of one to nine ppm of sodium metaphosphate. In fact, under the conditions used by Rube, 1–9 ppm of metaphosphate does not interfere with sulfate.

11. The Fresenius text should be interpreted in the light of the authorities referred to by him. The quotation reading:

"* * * the precipitation of calcium by the alkali carbonates is completely prevented or considerably interfered with by the presence of alkali citrates (Spiller) or metaphosphates (Rube)" (p. 144)

when read in the light of the article by Spiller and Scheerer reporting on Rube's work means "completely prevented" applies to the alkali citrates and "considerably interfered with" applies to the metaphosphates. The article by Spil-

ler contains no reference to the metaphosphates but states the precipitation of calcium is completely prevented by the alkali citrates. Spiller gives no quantity. Scheerer shows only partial interference with precipitation in a range of metaphosphate concentrations from 1590 to 8450 ppm.

12. The instruction of Fresenius to remove metaphosphates before carrying out the precipitation of calcium in an analytical procedure does not suggest or teach the addition of minute amounts of metaphosphate to hard water to prevent precipitation and prevent the formation of incrustation from the hardness components of the water.

13. Partial interference with precipitation may actually increase incrustation. It cannot follow that a warning to remove metaphosphate in an analytical procedure because it may interfere with precipitation, is a teaching the addition of minute quantities of metaphosphates will prevent incrustation, irrespective of the fact in quantitative analysis one deals with relatively concentrated chemical solutions while in plaintiffs' practices one deals with the stabilization of hard water.

14. Plaintiffs' practices do not correspond with the teachings of the Fresenius text, whether or not the text is interpreted in the light of the authorities referred to by Fresenius.

15. It would require more than a matter of routine experimentation for chemists to determine plaintiffs' practices in the light of the Fresenius text. The Fresenius text teaches nothing about the critical amounts employed in plaintiffs' practices. Plaintiffs thought they had made an invention at the time they first worked on the stabilization treatment of hard water and they regarded this invention as being a revolutionary and surprising development. They published literature to the effect the whole idea was so surprising it was like a "fairy tale" and the use of one part per million of anything to accomplish this

result was "preposterous" but true. At that time they knew about the Hall Reissue patent 19,719 because they owned that patent but they did not regard the use of relatively large amounts of metaphosphates to soften water as being a teaching minute amounts of metaphosphates would prevent incrustation caused by water.

16. Plaintiffs filed a Hall patent application in the Patent Office claiming the invention which now constitutes plaintiffs' practices and the Patent Office Board of Appeals allowed these claims over the Hall patent relating to the use of relatively large amounts of metaphosphate for water softening by sequestration. Later this Hall application became involved in an interference with the Fink and Richardson application and priority was awarded to Fink and Richardson. Plaintiffs are in no position to contend the use of large amounts of metaphosphates for water softening teaches the use of minute amounts of metaphosphates to prevent incrustation. Nor are they in any position to contend the disclosure of no amounts by Fresenius or the disclosure of amounts in the range of 1590 to 8450 ppm of metaphosphate by Scheerer, cited as authority by Fresenius, is a disclosure or teaching of minute amounts of metaphosphate in the order of 1 to 9 ppm, irrespective of the fact Fresenius is dealing with quantitative analysis of relatively concentrated chemical solutions while plaintiffs are dealing with the stabilization of water.

17. The holding of the court in the Economics case that there is "no demonstrable distinction" between the Hall Reissue patent 19,719 and the Fresenius text, 72 F.Supp. 689, does not suggest the Fresenius text is an anticipation of plaintiffs' practices under the Fink-Richardson patent. Plaintiffs themselves publicized as a notable discovery the water stabilization process under which they are now licensed, and themselves attempted to obtain a patent on the process, with full knowledge of the Hall Reissue patent.

## Opinion

The single issue to be decided is whether plaintiffs' practices correspond with the teachings of the Fresenius text. Plaintiffs have the burden of proof as to this issue. If they cannot sustain the burden I have already held in the decision of January 22, 1951, D.C.Del., 95 F.Supp. 323, the complaint will be dismissed.

1. The Fresenius text does not disclose plaintiffs' practices or the invention claimed in the Fink-Richardson patent. It does not require an expert to determine there is nothing in the Fresenius text about the employment of 1 to 9 ppm of polyphosphates for any purpose. There is no teaching the addition of 1 to 9 ppm of a polyphosphate to hard or incrusting water will prevent incrustation. The many distinctions between defendant's patent (i. e., plaintiffs' practices) and the Fresenius text, as established by the undisputed facts of record, show plaintiffs' practices are not taught by the Fresenius text. Defendant is entitled to prevail on the undisputed facts without regard to any of the controversial contentions of the parties.

No controversy exists as to what the Fresenius text describes. On the contrary, the dispute centers around the manner in which plaintiffs' witnesses seek to "interpret" Fresenius. Dr. Colburn made it clear under the guise of "interpretation" plaintiffs were really attempting to read into Fresenius something which was not there.[19] It is hornbook law prior art is only of value for what it actually shows.

Anticipation is not established by reconstructing a reference in the light of later accomplishments.[20]

2. Decision in the Economics case has no bearing upon plaintiffs' practices. Plaintiffs claim their practices are the same as the Fresenius text "as interpreted by the Courts in the Economics case" (Complaint, par. 13). The decision of the District Court in the Economics case had been handed down many months before the license agreement was entered into in January, 1948, as a result of the settlement of the prior litigation between the parties in this Court, and all that happened after that was complete affirmance of the District Court's decision. But entirely aside from this fact, there is nothing in the

19. Tr. 84.

20. In Young Radiator Co. v. Modine Manufacturing Co., 7 Cir., 55 F.2d 545 at page 547 in an opinion by Judge Sparks, the Court said:

"It is not sufficient to constitute anticipation that the device relied on for that purpose might, by modification, be made to accomplish the function performed by the patent in question if it were not so designated by its maker, nor adapted nor actually used for the performance of such function."

The same thought was expressed by the Supreme Court in Topliff v. Topliff, 1892, 145 U.S. 156, at page 161, 12 S.Ct. 825, 827, 36 L.Ed. 658, where the Court said:

"While it is possible that the Stringfellow and Surles patent might, by a slight modification, be made to perform the function of equalizing the springs which it was the object of the Augur patent to secure, that was evidently not in the mind of the patentees, and the patent is inoperative for that purpose. Their device evidently approached very near the idea of an equalizer; but this idea did not apparently dawn upon them, nor was there anything in their patent which would have suggested it to a mechanic of ordinary intelligence, unless he were examining it for that purpose. It is not sufficient to constitute an anticipation that the device relied upon might, by modification, be made to accomplish the function performed by the patent in question, if it were not designed by its maker, nor adapted, nor actually used, for the performance of such functions."

The Court of Appeals for the Eighth Circuit announced the same doctrine in Naylor v. Alsop Process Co., 168 F. 911, on page 920, where it said:

"When it is sought to ascertain the state of the art by means of prior patents, nothing can be used except what is disclosed on the face of those patents. Such patents cannot be reconstructed in the light of the invention in suit, and then used as a part of the prior art."

decision in the Economics case which could form the basis for holding plaintiffs' practices are the same as the teachings of the Fresenius text.

In the Economics case, the District Court, 72 F.Supp. 683, 689, held the Hall patent which was claimed to cover the practices of defendant Economics, was not valid, on the ground that "no demonstrable distinction exists" between the Hall patent and the Fresenius text. In other words, the Court in the Economics case said the Hall patent (PX 4) is the same as the Fresenius text. The Court of Appeals affirmed, 169 F.2d 65.

There is nothing in either of these decisions which has any bearing upon the Fink-Richardson patent or upon plaintiffs' practices which are covered by its license under the Fink-Richardson patent.

The Fink-Richardson patent (PX 6) is directed toward the stabilization process; that is, the prevention of incrustation by treating water with minute amounts of a polyphosphate. Claim 18 of the Fink-Richardson patent reads as follows:

"18. The process of treating water which consists in adding to the water sodium hexametaphosphate in an amount of the order of about 1 to 3 parts per million and not more than 9 parts per million."

The limits covered by this claim are those specified in the recital clause, paragraph (a) of the license agreement (Exhibit A to the complaint).

Plaintiffs admit in their complaint the Fink-Richardson patent differs from the Hall patent which was invalidated by reason of the Fresenius text. They say in paragraph 7 of the complaint:

"The Fink-Richardson patent differs from the Hall patent in that Fink-Richardson teaches the use of metaphosphate in much smaller quantities than taught by the Hall patent. The use of metaphosphate in the full amounts taught by the Hall patent not only prevents precipitation of calcium but also softens the water. The use of metaphosphate in the amounts taught by Fink-Richardson limits or prevents precipitation of calcium but does not soften the water."

Since in the license agreement of January 29, 1948 (Exhibit A to complaint) plaintiffs admit in recital (b) their activities "constitute participation in the practice of the invention claimed" in the Fink-Richardson patent, they cannot now say their practices are the same as the teachings of the Fresenius text. For if the Hall patent and the Fresenius text are the same, and if, as is admitted, the Hall patent and the Fink-Richardson patent are different, then necessarily, plaintiffs' practices which follow the Fink-Richardson patent, cannot be the same as the Fresenius text. What plaintiffs are saying is two things which are not equal to the same thing are nevertheless equal to each other. Such a contention cannot be followed.

In short, not only has there been no change of situation or of circumstances since the parties entered into the license agreement in 1948, but there is nothing whatsoever in the decision of either Court in the Economics case that can form any basis for holding plaintiffs' practices are the same as the teachings of Fresenius.

■ 3. Plaintiffs have not met the standard of identity of the Marcalus doctrine. Plaintiffs do not state the present state of the litigation at bar when they say:

"On Nalco's motion, this Court held that the Hall Companies are estopped to present prior art set up on the original action (pursuant to the Marcalus doctrine or otherwise) but it held that the Hall Companies might invoke Fresenius and the present issue was set down for separate trial."

I did not hold "that the Hall Companies might invoke Fresenius." In denying Nalco's motion for summary judgment, I said:

"While I do not consider it appropriate to rule on the question definitively at this time, my present thought is the Marcalus doctrine would not apply in the instant case for the broad basis of that

decision was the public interest in the common use of the expired patent." 93 F.Supp. at page 379. I held a final decision as to whether the Marcalus doctrine could apply, in other words whether plaintiff could "invoke Fresenius", would be deferred pending determination of the preliminary question whether plaintiffs' practices do in fact correspond with the teachings of the Fresenius text.

And again, in granting Nalco's motion for separate trial on the issue of identity between plaintiffs' practices and the teachings of Fresenius, I said:

"If it so develops on this issue the decision is in favor of plaintiffs, then the parties can proceed on any other issues which could be said to remain, and which the court will decide could remain. If the decision on this issue is in favor of defendant, this would seem to end the cause in this court". 95 F.Supp. at page 326.

There would be a number of issues remaining if I should decide for plaintiffs on the question of identity between plaintiffs' practices and the Fresenius text, including the question as to the limits of the Marcalus doctrine, plaintiffs' right in equity to avoid liability under the compromise and settlement of the previous litigation, etc.

I look at the Marcalus case as it bears on the issue of identity between plaintiffs' practices and the teachings of Fresenius. Automatic Paper Machinery Co. v. Marcalus Mfg. Co., 3 Cir., 147 F.2d 608, was an action by an assignee against the assignor of the patent charging infringement. The Court of Appeals (per Judge Biggs) decided the defendant should be held not to infringe, by reason of the fact the accused machine was a copy of a prior expired patent to Inman. The Court held the subject matter of a prior expired patent was in the public domain as "a matter of official record", 147 F.2d at page 613, and therefore defendant's machine could not be held to infringe plaintiff's patent. In reaching its decision the Court of Appeals emphasized the identity between the defend-ant's practices and the expired Inman patent, saying:

"The accused machine is in fact a Chinese copy of Inman's." 147 F.2d at page 610.

and again that except for "trivial" differences

"The accused machine, that of Inman and that of the Marcalus patent are as alike as peas in a pod." 147 F.2d at pages 612–613.

The Supreme Court affirmed, Scott Paper Co. v. Marcalus Co., 326 U.S. 249, 66 S.Ct. 101, pointing out:

"The patent laws preclude the patentee of an expired patent and all others including petitioner from recapturing any part of the former patent monopoly; for those laws dedicate to all the public the ideas and inventions embodied in an expired patent." 326 U.S. at page 256, 66 S.Ct. at page 105. More than that, the Supreme Court emphasized the identity between the accused machine and the expired Inman patent, stating:

"The accused machine is precisely that of an expired patent." 326 U.S. at page 254, 66 S.Ct. at page 103.

Thus, the point of inquiry is whether plaintiffs' practices are "a Chinese copy" of the Fresenius text, or that plaintiffs' practices are "precisely those" of the teachings of the Fresenius text. Nowhere in the Fresenius text is there any teaching whatsoever relative to prevention of incrustation. Nowhere is there any teaching of the addition of metaphosphates and most significantly of all, nowhere is there any teaching of the addition of minute quantities of metaphosphates. Excerpts from the Fresenius text can be read and nowhere will there be found a teaching of the water stabilization procedure taught by Fink-Richardson and practiced by plaintiffs pursuant to the license, whereby incrustation is prevented by the addition of minute quantities of polyphosphoric acid compounds in the range of from 1 to 9 parts per million and usually in the range of 1 to 3 parts per million.

Plaintiffs obscure this fact by saying Fresenius does not "exclude" the use of minute amounts and by talking about the skill of the art; but, when they claim the use of minute quantities of poly-phosphoric acid compounds to cause stabilization is merely a matter of ordinary skill of the art, they are repudiating the statements which they made over the years in applying for a patent on the water stabilization process and the statements which they made to their customers and to the trade asserting without reservation this process was revolutionary and a great contribution to the art. They made these statements with full knowledge of the Hall reissue patent held to be in substance the same as the Fresenius text.

4. Any doubt which may have existed, as to whether a licensee is in fact estopped to contest validity, has been completely resolved by the recent cases reaffirming the estoppel doctrine. Automatic Radio Mfg. Co. v. Hazeltine, 339 U.S. 827, 836, 70 S.Ct. 894, 94 L.Ed. 1312; Atlas Imperial Diesel Engine Co. v. Lanova Corp., D.C.Del., 79 F.Supp. 1002; Cold Metal Process Co. v. United Engineering & Foundry Co., 3 Cir., 190 F.2d 217, 218, 220. Under these judicial facts there is no basis for extending the scope of the Marcalus case.

5. As to the question of identity between plaintiffs' practices and the teachings of Fresenius, plaintiffs' own conduct in the series of suits in this court shows there is no such identity.

Plaintiffs knew about the Fresenius text and the decision by the trial court in the Economics case as early as May, 1947. D.C., 72 F.Supp. 683. Yet they did not plead Fresenius in the then pending case against Nalco. Under the liberal provisions of F.R. 8(e) (2), permitting alternative and hypothetical pleadings they could have done so, even though they had an appeal pending, if plaintiffs' practices even remotely resembled a "Chinese copy" of Fresenius' teachings as interpreted in the Economics case.[21] Moreover, plaintiffs were not yet licensed under Fink-Richardson and the issues in the case then pending between plaintiffs and Nalco, C.A. 538, were "validity" and "infringement" so they could have pleaded Fresenius merely as "prior art", if the text had any possible bearing on Fink-Richardson. They could have cited Fresenius as a reference, contingent on the outcome or correctness of the Economics case.

Instead, plaintiffs settled their action against Nalco in January, 1948, after it had been pending almost three years, the settlement including a license to plaintiffs under the Fink-Richardson patent (Ex. A to complaint). Paragraphs 8 and 9 stated the conditions under which plaintiffs were to be released of liability, and there was no mention whatsoever of Fresenius, the Economics case or about any release of liability if the Economics decision should be affirmed on appeal. Knowing about Fresenius, they agreed in the recitals their activities constituted practice of the invention of the Fink-Richardson patent.

Further, as a part of the settlement, plaintiffs agreed to the final judgment entered in C.A. 538 on February 10, 1948, which recited the parties "have settled and compromised this controversy." There was no suggestion to the court the controversy was settled only if the Economics decision was reversed on appeal.

And then after making three quarterly payments under the license agreement, plaintiffs began its second declaratory judgment action in this court against Nalco asking to be relieved of their agreed liability on the ground the affirmance by the Eighth Circuit of the

---

21. For example, in Dollar v. Land, 81 U.S.App.D.C. 28, 154 F.2d 307, 310, affirmed 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209, the plaintiff pleaded a contract was void, or, if it was not, it represented a pledge of securities. See Moore on Federal Practice, Vol. 2, para. 8.31, for other instances of hypothetical pleadings.

decision of the trial court in the Economics case, in its entirety, constituted a "new situation".

Plaintiffs' practices were not a "Chinese copy" of Fresenius' teachings either before or after the decision of the trial court in the Economics case. If they had any conceivable relation to the Fresenius text, Fresenius could have been pleaded, hypothetically, if plaintiffs thought necessary. They were not as alike as "peas in a pod" when the case was settled. If so, plaintiffs could have raised the matter in connection with the escape clauses of the license and raised it to the court in making the representations the controversy was settled. They were not "Chinese copies" or "peas in a pod" then, and the mere fact the Eighth Circuit affirmed in toto the Economics decision below does not make them identical now.

The claim of a "new situation" is merely an attempt to avoid a liability knowingly agreed upon. In Galion Iron Works v. J. D. Adams Mfg. Co., 7 Cir., 105 F.2d 943, the license agreement was entered into in order to avoid litigation and the licensee specifically agreed to pay a royalty on each motor grader manufactured by it. In holding the defense of the prior art did not apply, the Court said, 105 F.2d at page 946:

"Both parties intended that until there was a decision of invalidity or non-infringement, appellant was bound to pay a royalty of $25 for each structure made and sold by it which embodied any one or more of the claims in suit, regardless of whether such claim or claims was or were, in fact, invalid, or whether, in fact, such structure or structures infringed."

It is established when voluntary compromises and settlements are reached for the purpose of determining matters in doubt between the parties, such compromises are conclusive. Pomeroy's Equity Jurisprudence, Vol. 3, § 850.

This principle has been repeatedly recognized, and as stated in Chicago & North Western Railroad v. Wilcox, 8 Cir., 116 F. 913, 914–915:

"* * * where parties have knowingly and purposely made an agreement to compromise and settle a doubtful claim, whose character and extent are necessarily conditioned by future contingent events, it is no ground for the avoidance of the contract that the events happened very differently from the expectation, opinion, or belief of one or both of the parties."

6. Here plaintiffs do not claim there has been any judicial attack upon the Fink-Richardson patent and, in fact, there has been none. If plaintiffs' contentions are correct the decision of the Court of Appeals in the Economics case permits them to avoid the license agreement, and, in effect nullify the value of the Fink-Richardson patent—to agree would render useless compromises and settlements of litigation in patent cases.

Conclusions of Law

1. This court has jurisdiction.

2. Plaintiffs are estopped to contest validity of the Fink-Richardson patent for they are licensees under a license agreement dated January 29, 1948.

3. Plaintiffs are estopped to contend they have been evicted from the benefits of said license agreement, or to contend their activities are justified by the alleged prior art for the following reasons, any one of which alone is sufficient to create such estoppel:

a. For the reason said license agreement was entered into by plaintiffs with full knowledge of all the alleged prior art described in the complaint;

b. By reason of the fact paragraphs 8 and 9 of said license agreement expressly provide the sole circumstances under which plaintiffs may be relieved of their obligation under the license agreement and none of the circumstances described in said paragraphs have existed or do now exist;

c. By reason of the fact that in recitals (a) and (b) of the license agreement plaintiffs expressly admitted and agreed their activities constitute partici-

pation in the inventions claimed in the Fink-Richardson patent;

d. By reason of the fact they made three payments of royalties under the license agreement, then having full knowledge of all of the alleged prior art described in their complaint herein, and their practices have not changed;

e. By reason of the fact said license agreement was entered into as an integral part of the compromise and settlement of the litigation then pending between plaintiffs and defendant in this court, C.A. No. 538, at which time plaintiffs were fully aware of all of the alleged prior art described in their complaint herein;

f. By reason of the fact plaintiffs seek to relitigate the matters of which they had full knowledge at the time the previous suit was settled and compromised, which they may not do in a court of equity.

4. Even if plaintiffs were not so estopped, and without deciding as to the scope to be given to the decision in Scott Paper Co. v. Marcalus, 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47, plaintiffs have not been evicted from the benefits of the license agreement by reason of the teachings of the Fresenius text as interpreted in Hall Laboratories v. Economics Laboratory, D.C.Minn., 72 F. Supp. 683, affirmed 8 Cir., 169 F.2d 65, nor do plaintiffs' practices covered by said license agreement correspond with the teachings of said Fresenius text, as interpreted in the Economics case.

5. Plaintiffs have neither alleged, nor is there any evidence any of the contingencies provided for in paragraphs 8 and 9 of the license agreement have occurred or exist.

6. Absent the happening of any of these contingencies provided for in paragraphs 8 and 9 of the license agreement, plaintiffs are bound by the terms of the agreement and obligated to pay royalties thereunder.

7. Irrespective of the correctness of the decision in the Economics case, decision in that case involved different par-

ties and different subject matter and is not controlling here.

8. Defendant is entitled to receive all of the royalties under the license agreement which have been deposited by plaintiffs with the Clerk of this Court.

9. Defendant is entitled to a decree dismissing plaintiffs' complaint with prejudice, and awarding costs to defendant to be determined by Mr. Pollard, the Clerk of this Court.